[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a fully contested action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff and the defendant, whose maiden name is Sheila M. Servidio, were married at Danbury, Connecticut, on August 15, 1992. The plaintiff has resided continuously in the State of Connecticut for a least twelve months immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There is one minor child issue of this marriage, Angelina M. Pollen, born November 29, 1994. No other minor children have been born to the defendant wife since the date of marriage of the parties. Neither party has received state assistance.
The plaintiff claims that the marriage began to deteriorate when he believed he could no longer trust the defendant as a result of her alleged use of family funds to purchase drugs. From the evidence presented, the court finds that there is no credible evidence that the defendant is continuing to use illegal drugs at this time, and no credible evidence that the defendant used family funds to purchase drugs.
From the evidence presented, the court finds that the parties are equally fault for the breakdown of the marriage.
The plaintiff has been employed as an electrician by Rogers Electric for approximately eighteen years. The plaintiffs normal working hours as CT Page 9920 an electrician are from 6:30 a.m. to 3:30 p.m. He is a foreman. The parties have been married for approximately eight years. The plaintiff has a 401K plan with Rogers Electric with a balance of $22,269. That 401K plan was started approximately four years ago. The plaintiffs gross weekly income is of $1126, includes his regular pay, as well as his overtime, holiday and sick pay. He presently has health insurance that also covers the defendant and the minor child. His cost for health insurance for himself and the minor child will be $57.76 weekly. The COBRA benefit cost for the defendant will be $222 per month.
The plaintiff has a debt to his mother and father in the amount of $1200 that was incurred on July 7, 1999. That debt represents a loan that was used to make payments on the mortgage and purchase groceries. He has a Chase MasterCard liability with a balance of $1007. The Chase MasterCard is in both names. The debt was incurred both by the plaintiff and the defendant. He has a Sears liability with a balance of $364. The Sears credit card is in the plaintiffs name only. It was used both by the plaintiff and the defendant.
The plaintiff applied for the home equity line on July 29, 1999 in the amount of $15,000. He and his parents signed the application. The balance must be paid by July 27, 2024. He initially drew $3000 on the home equity line on or about July 27, 1999 that was used for attorney's fees. He has not made any subsequent withdrawals from the home equity line. The balance due on the home equity line is $2668.
The plaintiff has a 1995 Pontiac with a value of $9825 and no loan. It is in his name only and was a gift from his parents in 1997 or 1998. That vehicle is driven by the defendant. The plaintiff also has a 1987 Chevrolet Blazer with a value of $2600 and no loan balance. That vehicle is in the plaintiffs name only and is used by him. The plaintiff has the following life insurance policies through Northwestern Life Insurance:
 Policy No. Plan Total Annual Cash Death Benefit Premium Surrender Value
 12476736 Whole Life $ 21,369 $283.20 $1486.80 12476747 Term $ 80,000 $ 88.00 None 14233418 Term $200,000 $238.00 None 12476719 Whole Life $ 21,456 $229.00 $1163.48 12476732 Term $ 80,000 $ 68.80 None
The plaintiff owns a Bayliner boat, motor and trailer that was a gift from his parents. Its fair market value is $1520. The plaintiffs financial affidavit dated May 9, 2000 shows an $85 expense for day care. That amount is presently not being paid and is only a projected cost in CT Page 9921 the event he obtains custody.
The COBRA cost for the defendant will be $222 monthly. Health insurance for the plaintiff only would be at no cost to him. In order to cover the minor child, there will be a cost of $57.76 weekly.
During the time this action has been pending, the plaintiff paid off a Discover Card that had a balance of approximately $876 and had been used by both the plaintiff and the defendant. He also paid off a Texaco credit card with a balance of approximately $440 that had been used by both the plaintiff and the defendant. He also paid off a VISA credit card that had a balance of $166 that was used by both parties. He also reduced the Sears credit card balance from $666 to $364.
This court has had the benefit of a thorough and competent custody and visitation evaluation report with a completion date of April 7, 2000, as well as the testimony of the Family Services officer who did the report. Based on that report, the testimony of the Family Services officer, and other evidence, the court finds the following facts:
 While this evaluation was pending the mother and father continued to reside in the marital home with the child. Prior to completing this evaluation, the mother and father were arrested on 1/10/00 for Disorderly Conduct and subsequently referred to the Family violence Education Program. These criminal matters were pending at the time the evaluation was completed.
 Mr. and Mrs. Pollen indicated that they had difficulty communicating and trusting each other. Both parents noted that they continued to have difficulty residing in the same home and attempted to maintain a regular schedule for the child to the best of their ability. The mother helped the child get dressed and fed in the morning. She then transported the child to and from school on Tuesday, Wednesday, and Friday afternoons. The father picked up the child on Monday and Thursday afternoons from school, provided dinner, and assisted the child in getting ready for bed.
Ms. Pollen filed a motion for exclusive possession of the marital home that was heard by the court and subsequently denied. Due to concerns of continued conflict, Ms. Pollen occasionally spent time at the home of her relatives and significant other, John CT Page 9922 Wilson. Mr. Pollen noted that the child missed her mother and was observed waiting for her during the evening to tuck her into bed.
. . .
 This writer was able to observe the child on two occasions, once with her father and once with her mother. This evaluator also interviewed the child at the Family Services Office. It appears that the child has a more anxious attachment to her mother at this time. The anxiety appears to be in part associated with child's strivings to maintain a relationship with her mother and being unsure of how to please her and win her affection. The child did not appear to exert as much energy trying to please her father and appeared assured that her father is a consistent and dependable care giver. The child worried about being fair to her mother as she shared an example of how her parents fought over whom would take her to Family Services for an individual interview. The child spoke of how her father is able to "do everything," how he is "excellent" and mommy is "O." When asked to clarify the child stated that she wanted her mother to bring her to the appointment at Family Services because "Daddy always gets to."
The court finds that the plaintiff is presently more consistent than defendant in having dinners prepared for the child, in helping her with her homework, and preparing her for bed. The court has concerns regarding allowing the defendant to have overnight visitation at this time as there is uncertainty as to where she will be living following the dissolution of marriage and what type of accommodation will be available for the minor child.
The minor child has shown anxiety regarding the failure of the defendant to be at home when it is time to tuck her into bed. Since July of 1999, defendant on various occasions has told the child that the defendant would be home to put the child to bed and then breaks that promise thereby upsetting the child. The plaintiff has a great relationship with the child. He takes her to parks and to visit with relatives. He has also taken her to Wisconsin to see his parents. The defendant has chosen to spend less time with the child since July of 1999. The child has an affectionate relationship with the plaintiff and they play well together. CT Page 9923
On November 28, 1999, a birthday party was held for the minor child whose birthday is on November 29. Approximately eleven children attended that party. The plaintiff invited the defendant to the party. He made all the party arrangements. The defendant attended the party bringing Mr. Wilson's son to the party. When the party ended, the defendant left with Mr. Wilson's minor child to return to the Wilson home thereby upsetting Angelina and making her cry. The defendant has not bathed the child since January of 2000. The last meal that she cooked for the child was on January 19, 2000. The plaintiff does the food shopping and laundry for himself and the child. He participates in most of the child's activities. He intends to continue to reside in the two bedroom condominium that he owns that also has a living room, dining room and kitchen if he is awarded custody of the child.
Prior to July of 1999, the defendant was the primary care giver for the minor child. While she was out some nights doing nails, most of the time she was caring for the child. After their daughter was born, the defendant stayed home raising the child while the plaintiff was working. The defendant returned to work approximately one year after the child was born doing nails part-time because she felt "crazy" being in the home all day. The defendant felt resentful that the plaintiff had an outlet of golfing or bowling with his friends but did not support her need to socialize, which socialization would last until 1 a.m. The defendant enjoyed going out for drinks and appetizers and/or dancing with her friends. She usually did her nail work in the evening after the plaintiff returned home from work that would allow the plaintiff to then care for the child while she was working. She was working an average of two to three nights up until the time the dissolution of marriage proceeding was filed. The child started school in July of 1999.
The child behaves better in the presence of the plaintiff than in the presence of the defendant. The plaintiff is the one who helps the child with her school work. Since this action commenced, when the child has been visiting with her grandparents in Wisconsin or in Florida, as well as on one occasion when in the condominium in Danbury, the child on about 25 percent of the time, has not wanted to talk to the defendant on the telephone. The plaintiff has encouraged that the child talk to the defendant on the telephone. The plaintiff is very gentle and patient with the child and is a wonderful father. He is very good at redirecting her behavior when the child misbehaves and have a calming and loving affect on the child. The defendant would often leave to others redirecting the child's behavior when the child was acting up.
The defendant began a dating relationship with John Wilson while the Family Relations evaluation was pending. The defendant spends every Saturday evening at the Wilson home. She would sometimes return home CT Page 9924 during the week between 4 to 5 a.m. That evaluation was referred to Family Services on September 13, 1999 and completed on April 7, 2000. John Wilson declined the request from the Family Services officer for a criminal background check because he did not want his criminal background to have a negative impact on the defendant's request for custody of her daughter. The court has concerns about having the child in the presence of John Wilson in the absence of a criminal background check to determine the nature of his criminal background.
Family Services has recommended that the plaintiff have sole custody of the child with the defendant having visitation on Tuesdays and Thursday from after school until 6 p.m., and Saturdays from 10 a.m. to 6 p.m.
 The attorney for the minor child has made the following recommendations:
 1. Custody: Although it is my opinion that both parties love Angelina and want the best for her, I do not think that this is a joint custody case due to the level of animosity and distrust between the parties. I would therefore recommend sole custody to the Father/Plaintiff.
 2. Visitation: Currently, the Mother/Defendant is living in the marital home. The father shall remain in the home with Angelina and the mother will be finding an alternative location to live. Until such time that Sheila can find a safe and appropriate home for she and her visiting father, I would recommend the same schedule as is set forth in the report from Heather Clinton. Tuesday and Thursday after school, and from 10:00 to 6:00 on either Saturday or Sunday. During the summer months, if Sheila's work schedule allows, the Tuesday and Thursday visitation shall be from 10:00 to 6:00. Mrs. Pollen's trade is as a nail technician, and could be flexible.
 3. As soon as Mrs. Pollen locates a place to reside, it is my opinion that the issue of overnight visitation should be reviewed. As attorney for the minor child, I will be willing to visit Sheila's new home and file a subsequent report to the two attorneys for their review. I would hope that Family Relations would also render an opinion.
4. Substance abuse and therapy: It is clear that the CT Page 9925 issue of drug and alcohol abuse should be treated seriously and followed up. I would suggest that Mrs. Pollen continue to be treated by Mr. Ed Edger and that random testing be ordered. In addition, I would hope that the court order some type of family therapy so that the parties can work more closely together with regard to Angelina. I would be willing to set up such a therapeutic schedule, if the court should wish.
 5. I would also recommend that any and all visitations at this point that Sheila enjoys with Angelina should not include her friend, John Wilson.
 6. Holidays and extended visits: Due to the fact that there would be no overnight visitation immediately, the issue of holidays and extended visitations should be revisited when Sheila has settled into her new home. I would ask that the obvious upcoming holidays be shared, such as Father's day with dad (hopefully Sheila spent Mother's Day with Angelina), July 4th, Thanksgiving, and Christmas Day shall be alternated.
 7. Due to the income level of the Defendant/Mother, I would ask that no child support be ordered at this time so that Sheila can begin to save for a safe and appropriate place for her and her visiting child.
In discussing the best interests of the child standard, the court in Blake v. Blake, 207 Conn. 217, 224 (1988) stated in part as follows:
 In making a determination of custody . . . the trial court is "bound to consider the child's present best interests and not what would have been in her best interests at some previous time." [Emphasis provided]
The Blake court also cited with approval the case of Yontef v. Yontef,185 Conn. 275, 283, 440 A.2d 899 (1981). The Yontef court held in part as follows:
The test is not which parent was the better custodian in the past but which is the better custodian now. See, e.g., Trunik v. Trunik, 179 Conn. 287, 290, 426 A.2d 274 (1979); Spicer v. Spicer, supra, 164; Simons v. Simons, supra, 350. Just as we have refused to adopt a conclusive presumption that a mother is CT Page 9926 always entitled to custody in preference to a father; see, e.g., Simons v. Simons, supra, 350; so also have we rejected any presumption that a parent's life style necessarily has an adverse effect on a child. Gallo v. Gallo, 184 Conn. 36, 42, 440 A.2d 782 (1981). In the exercise of its awesome responsibility to find the most `salutary custodial arrangement for the children of divorce, the court must however take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth. development and well-being. [Emphasis provided.]
From all the evidence presented, the court finds that it is in the best interests of the minor child that the plaintiff be awarded sole custody of the minor child.
The defendant graduated high school in January, 1984. When the parties married, the defendant was working as a lab technician for a photographer earning slightly over $200 weekly. She subsequently switched jobs to work at Volpe Nails grossing $280 weekly. She had that job up until the time the minor child was born. At the end of 1988, or in early 1999, the defendant returned to photography work on a part-time basis averaging three nights a week from 5:30 or 6 p.m. to anywhere from 9 to 11 p.m. Her take home pay would be $125 weekly. She would normally get home between 10 to 11 p.m.
The defendant did not have any assets when the parties married.
The defendant was born on April 11, 1965. She is very healthy.
The defendant is a self-employed nail technician and also works for a photographer.
The defendant has been working full-time at a photography studio since on or about April 1, 2000. Her hours are 9 a.m. to 5 p.m. Monday through Friday.
The defendant has gross weekly income of $340, and for child support guideline purposes, net weekly income of $262 from her employment at the photography studio. She also has part-time gross weekly income of $60 as a nail technician. Her combined net weekly income is $324. The plaintiff has net weekly income for child support guideline purposes of $720. CT Page 9927
The defendant has a liability to Filene's with a balance of $400 that was solely incurred by her. She also has a balance owed to Macy's in the amount of $300 that was solely incurred by her. She also owes Paul Korker a loan for a retainer fee in the amount of $750. She intends to find a small efficiency to rent after the dissolution of marriage is granted and will need money for a security deposit. Although not shown on her financial affidavit, her brother is holding $420 of her funds that she intends to use as a security deposit.
Under the child support guidelines, the amount of support that the defendant would pay to the plaintiff would be $55 per week, plus 21.52 percent of unreimbursed medical and qualifying child day care costs.
The plaintiff requests that the court not order the defendant to pay to him support or qualifying day care expenses in order for her to be able to financially get back on her feet. He feels that if he receives support from her that she would not be able to obtain appropriate living quarters and that obtaining appropriate living quarters is in the best interest of the minor child. This court agrees with the plaintiff that it is in the best interest of the child that the guidelines be deviated from. The court finds that the guidelines are inappropriate and inequitable based on the best interests of the minor child and other equitable factors and therefore deviates from the guidelines.
The family condominium located at 27 Crow's Nest Lane, Danbury, Connecticut, was purchased on November 4, 1986 for $122,900. Title is held jointly by the plaintiff, his mother and his father. Title is not in the defendant's name. The defendant did not sign the promissory note or mortgage deed. The parties were not married or dating when the condominium was purchased. There is a first mortgage on the condominium held by Webster Bank with a balance of $79,424.77 as of April 17, 2000. The plaintiffs financial affidavit of May 9, 2000 shows a mortgage balance of $103,000. The $103,000 balance includes the funds that he owes to his parents for the purchase of the condominium.
The plaintiff has an equity in the condominium of approximately $1000 for his one-third interest.
The plaintiff's parents provided $12,000 for the down payment on the condominium on or about November 6, 1986. They also provided a second check towards the purchase of the condominium on or about March 4, 1986 in the amount of $11,061, as well as a 1 percent initial deposit for the purchase of the condominium on February 16, 1986 in the amount of $1229. It was financed in. part with a first mortgage in the amount of $98,000. His parents also provided $850 on or about July 2, 1986 for some extras for the condominium. They also paid at a closing $341.64 for the balance CT Page 9928 due to purchase a condominium; $559.50 for attorney's fees and recording fees; $350 for title insurance; $148.76 for two months condominium association fees; $806.40 for a mortgage reserve; and $1470 for the balance that was due for the one and a half points as part of the mortgage. The plaintiffs parents have used the condominium on occasion. The balance due to the plaintiffs parents is approximately $23,500. Following the birth of the minor child, Angelina, the plaintiffs parents agreed to allow the plaintiff to repay them when he could afford to do so and eliminate interest on the balance due to them.
The court finds that the total reasonable counsel fees incurred by counsel for the minor child is $1600. The plaintiff and the defendant agree that those fees should be divided equally between them. The plaintiff is therefore responsible for $800 of those fees for which he has already paid $300, leaving a balance due by the plaintiff to counsel for the minor child of $500. The balance due by the defendant to counsel of the minor child is $800.
This court has considered the provisions of § 46b-82 regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property division, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees, and has considered the provisions of § 46b-56 and § 46b-56a regarding the issue of custody and joint custody and visitation, and has considered the provisions of § 46b-84 and the child support guidelines regarding the issue of support. The court enters the follows orders:
 ORDERS
A. BY WAY OF DISSOLUTION OF MARRIAGE
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF CUSTODY, VISITATION SUPPORT
1. The court awards to the plaintiff sole custody of the minor child.
2. The court awards to the defendant the following visitation rights: (a) Tuesdays and Thursdays from after school until 6 p.m.; and (b) Saturdays from 10 a.m. to 6 p.m. The defendant shall have the child each Christmas Eve Day from 8 a.m. through 7 p.m. at which time the child will be returned to the plaintiff. The plaintiff shall have the child on Christmas Eve from 7 p.m. through Christmas morning at 11 a.m. at which time the defendant will pick up the child. The defendant shall continue to have access to the child until December 25 at 5 p.m. The parties shall CT Page 9929 alternate all other major holidays. Each Mother's Day, the child shall be with the mother, and each Father's Day, the child shall be with the father.
3. The court is not awarding overnight visitation at this time due to the fact that the defendant does not presently have any definite plans as to where she will be moving and what type of accommodations will be available for overnight visitation with the minor child.
4. The minor child is not to be left alone with John Wilson due to his refusal to allow the release of his criminal records as part of the Family Relations study. The court is concerned as to what those convictions may be insofar as they relate to what is in the best interests of the minor child.
5. The defendant is ordered to pay to the plaintiff support in the amount of $1.00 per year. She is not ordered at this time to pay any part of the qualifying child care expenses. The court orders that the defendant pay to the plaintiff 21.52 percent of all unreimbursed medical expenses. The plaintiff is to provide medical insurance for the benefit of the minor child as is available through his place of employment. This deviation from the child support guidelines regarding support and day care is to continue until the defendant is able to obtain appropriate living quarters or until there is a substantial change in circumstances, whichever event first occurs. Under the child support guidelines, the amount of support that the defendant would pay to the plaintiff would be $55 per week and the amount of unreimbursed medical expenses payable by the defendant would be 21.52 percent. The court finds that the guidelines are inappropriate and inequitable based on the best interests of the child and other equitable factors.
C. BY WAY OF PROPERTY ORDERS
1. The plaintiff is to pay all of the liabilities shown on his financial affidavit and hold the defendant harmless.
2. The defendant is to pay all of the liabilities shown on her financial affidavit and hold the plaintiff harmless.
3. All of the plaintiffs interest in the condominium located at 27 Crow's Nest Lane, Danbury, Connecticut, is awarded to the plaintiff.
4. The 1995 Pontiac is awarded to the defendant. The plaintiff is to sign all documents necessary to transfer title to her by September 29, 2000. CT Page 9930
5. The 1987 Chevrolet Blazer shown on the plaintiffs financial affidavit is awarded to the plaintiff.
6. The Bayliner boat, motor and trailer, as well as all household furniture and furnishings at the condominium, are awarded to the plaintiff.
7. The First Union checking account shown on the plaintiffs financial affidavit is awarded to the plaintiff.
8. All of the Northwestern policy life insurance policies including their cash surrender value are assigned to the plaintiff.
9. The Rogers Electric 401K plan shown on the plaintiffs financial affidavit is ordered divided equally between the parties by QDRO. The parties are to divide equally the cost for preparation of the QDRO, with the plaintiff being responsible for its preparation.
10. The college fund shown on the plaintiffs financial affidavit for the minor child is awarded to the plaintiff.
11. The $420 held by the defendant's brother is awarded to the defendant.
D. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either the plaintiff or the defendant.
2. The plaintiff is to pay the balance of $500 that he owes to counsel for the minor child at the rate of $50 weekly commencing September 29, 2000 and weekly thereafter. The defendant is to pay the balance of $800 that she owes to counsel for the minor child at the rate of $50 weekly commencing September 29, 2000 and weekly thereafter.
E. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature who in turn is to send it to counsel for the minor child for signature and filing.
2. The plaintiff and the defendant are to exchange copies of their federal and state income tax returns within fifteen days after such returns have been filed by certified mail return receipt, or registered mail return receipt commencing with the tax returns for the calendar year CT Page 9931 2000 for so long as there is any outstanding support order or any arrearage thereto.
Axelrod, J.